ELY SAVINGS BANK, Appellee, v. JAMES S. GRAHAM et al., Appellees; MINNIE KLINE, Appellant.

**MORTGAGES:** Lien and Priority—Purchase-money Mortgage—Burden 1 **to Establish.** A real estate mortgage may not be deemed a *purchase-money* mortgage and have extended to it the pre-eminent right of priority over all other liens and claims arising through the mortgagor unless the holder distinctly establishes the fact that the money secured by the mortgage was advanced for the *express* purpose of paying the purchase price of the land. Evidence held insufficient to show such fact. (See Book of Anno., Vol. 1, Sec. 10105, Anno. 36.)

**VENDOR AND PURCHASER:** Operation of Contract—Purchase From 2 **Non-title-holder—Equitable Ownership.** A contract purchaser of real estate becomes the equitable owner, and his actual possession is notice to the world of his rights, even though he purchases from a person who has *no title whatever,* but who assumed equitable own-

ership, and who later had such assumption ratified and confirmed in himself by a contract of purchase and by a deed of conveyance from the legal title holder. (See Book of Anno., Vol. 1, Sec. 10105, Anno. 115 *et seq.*)

VENDOR AND PURCHASER: Construction of Contract—Merging Unpaid Payments Into Mortgage. Provision in contract of purchase reviewed, and held simply to contemplate the merging of unpaid payments into a mortgage, and not to authorize the vendor to execute a mortgage on the property sold.

VENDOR AND PURCHASER: Construction of Contract. Provision in contract of purchase reviewed, and held to present no obstacle to the purchaser's claiming, against a mortgagee, the benefit of payments made to the vendor.

Headnote 1:  27 Cyc. pp. 1182, 1229.  Headnote 2:  39 Cyc. pp. 1612, 1756.  Headnote 3:  27 Cyc. p. 1192 (Anno.)  Headnote 4:  27 Cyc. p. 1192 (Anno.)

*Appeal from Linn District Court.*—F. L. ANDERSON, Judge.

APRIL 6, 1926.

SUIT in equity, to foreclose a real estate mortgage. The makers of the mortgage sued on were defendants James S. and May E. Graham. The defendant Mrs. Minnie Kline was made a party, under the allegation that she claimed some interest in the mortgaged premises. The defendants Graham appeared by counsel, but filed no answer and interposed no defense. The defendant Mrs. Kline filed an answer and cross-petition against her codefendants and against the plaintiff, setting up an alleged title in herself, superior to the plaintiff's mortgage. Decree was awarded to plaintiff, as prayed, establishing the lien of its mortgage as superior to the claim of the defendant Kline. From such decree the defendant Kline has appealed.—*Reversed.*

*Crissman & Linville,* for appellant.

*Stewart, Penningroth & Holmes,* for appellee plaintiff.

*Johnson, Donnelly & Lynch,* for appellee defendants.

EVANS, J.—The mortgage in suit bears date November 10,

1919.  It was drawn to cover the west 40 feet of a certain Lot 10, of a certain addition to Cedar Rapids.  The length of such Lot 10 was 140 feet.  The defendant Mrs. Kline claims to have become the purchaser, on October 11, 1919, of the south 100 feet of the mortgaged property, and claims that she entered into actual possession of her property on or about said date, and was, and has been, in possession thereof ever since, without any notice of plaintiff's mortgage until about four years after the date of her purchase.  Both the plaintiff and this defendant claim under James S. Graham, as the source of the right and title of each.

1. MORTGAGES: lien and priority: purchase-money mortgage: burden to establish.

It appears without controversy that Mrs. Kline entered into a written contract of purchase of said south 100 feet of the mortgaged property, with James S. Graham, on October 11, 1919; that the purchase price thereof was $5,800; that she paid $400 of such price on October 11th, and the further sum of $100 on October 31st; that she was required by the terms of her contract to pay the further sum of $2,000 on March 1, 1920; that the balance of the purchase price was to be paid in smaller installments, extending over a considerable period of time; that she made all payments under her contract punctually, in accord with its terms, and had paid a total on such contract of more than $4,000 before she discovered the existence of plaintiff's mortgage.  Time was made the essence of her contract.  Her contract was never placed of record, but she was in actual possession of the property at all times since on or about the date of her purchase.  The property comprised a dwelling house and garage, which she occupied with her family, as her home.  On the date of Mrs. Kline's purchase, and also on the date of the plaintiff's mortgage, the legal title of the mortgaged property was in one Roe, and so appeared of record.  Such legal title was transferred to Graham on November 15, 1919.  Sometime before such transfer, however, Graham had become the equitable owner of such property by a written contract of purchase, entered into between him and Roe, whereby Graham agreed to pay the price of $6,200 therefor, and did pay, at the time of the execution of such contract, a part of the purchase price.  Such contract of purchase by Graham was not available

at the trial, having been previously lost, and the actual date thereof appears only by approximation.

In order to avoid the legal effect of the priority of date acquired by Mrs. Kline, the plaintiff puts forward the following contentions:

(1) That its mortgage was a purchase-money mortgage; (2) that Graham had no title, legal or equitable, in the mortgaged property on October 11th; that the title, both legal and equitable, was in Roe; that, therefore, such defendant acquired no interest in the realty by virtue of her contract with Graham; that her purported possession of the property thereunder was that of a mere trespasser, and imparted to the plaintiff no notice of any right or claim of right to the property. This contention indicates the general line of the controversy presented.

In its first contention, the plaintiff relies upon a rule of priority which is quite generally recognized in all the authorities. Its general nature is indicated by the following excerpt from 19 Ruling Case Law, Section 196, page 416:

"It is a general rule, to which there is little dissent, that a mortgage on land executed by the purchaser of the land contemporaneously with the acquirement of the legal title thereto, or afterwards, but as a part of the same transaction, is a purchase-money mortgage and entitled to preference, as such, over all other claims or liens arising through the mortgagor though they are prior in point of time; and this is true without reference to whether the mortgage was executed to the vendor or to a third person. * * * A mortgage given to secure money to be applied on the purchase price of land, although given after the execution of a deed of the property mortgaged, the mortgagee paying the money to a third person with whom the deed had been deposited in escrow until the payment of the purchase price, and securing the deed and delivering it to the mortgagor, is nevertheless a purchase-money mortgage, and takes precedence over other liens and claims."

Likewise, from 27 Cyc. 1182, the following:

"Where a purchaser of land, at the same time he receives a conveyance, executes a mortgage to a third person, who advances the purchase money for him, such mortgage is entitled to the same preference over other liens existing against the mort-

gagor as it would have had if it had been made to the vendor himself. *But the money must have been loaned with the express purpose and intention that it should be used in paying the purchase price of the land. The mere fact that it was so used without any understanding to that effect will give the lender no superior equity. And if the purchaser of land is already indebted to the vendor for the price of the same, and then borrows money from a third person for the purpose of discharging this debt, and gives the latter a mortgage on the land, this mortgage is not entitled to the standing of a purchase-money mortgage.*"

The foregoing rule has had consideration by this court in *Laidley v. Aikin,* 80 Iowa 112; *Kaiser v. Lembeck,* 55 Iowa 244; *Gilman v. Dingeman,* 49 Iowa 308; *Nicholson v. Aney,* 127 Iowa 278.

The rule of law as here stated is not challenged by the defendant-appellant, but it is earnestly contended that the evidence in the record does not bring the plaintiff within its operation. The major controversy is over this question of fact.

I. As preliminary to the consideration of this ultimate question of fact, it becomes necessary for us to determine first whether the defendant Kline acquired any interest, legal or equitable, by virtue of her contract with Graham on October 11th. It is not disputed that, if Graham had a written contract with Roe for the purchase of this property on or before October 11th, he became thereby the equitable owner of the property, subject, of course, to the vendor's lien for his purchase money. If Graham was such equitable owner, then his contract with the defendant Kline was effective to transfer to her an equitable ownership, subject to the terms of the contract. It cannot be doubted that, as against Graham, the contract itself, entered into between him and defendant Kline, was sufficient evidence of his equitable ownership at the time of its execution. True, it would not be sufficient evidence of such ownership as against Roe, who held the legal title; but Roe is not complaining. He never repudiated any act done by Graham pertaining to the possession or control of said property. On the contrary, his subsequent conveyance was a complete ratification thereof. It is enough for our present purposes that Graham

2. VENDOR AND PURCHASER: operation of contract: purchase from non-title-holder: equitable ownership.

himself could not impeach such contract as evidence of his equitable ownership. If such proof is sufficient as to Graham, is it less so as to the plaintiff? Graham is no less the source of plaintiff's title than he is the source of title of the defendant Kline. Moreover, the initial letter written by Graham to the plaintiff, soliciting the loan thereafter made, was written on October 13, 1919, and was as follows:

"Gentlemen:

"The next time you are in Cedar Rapids wish you would reinspect No. 1812 Blake Boulevard. This is a modern home of seven room, oak down and hard pine up. It is in fine condition. The lot is 40x140.

"On the rear of the lot is a four stall brick garage that brings in $14.00 per month. There is also a good garage built next to house with driveway to same. The house is on good stone foundation. We sold the house with garage and front 100 feet of the lot for $5,800. $500 cash. Two thousand on or before March 10th, 1920, balance payments or deed subject to mortgage. The purchaser is from Hampton, Iowa.

"We would like a loan arranged as follows, $3,750, on front 100 feet, this loan to be reduced to $3,300 next March when above payment is received.

"A loan on rear part of $850, payable $100 or more on interest pay date. The title at present is in James J. Roe. We would take it over and make loan ourself. We would not care for the funds until Nov. 1st, but could use it earlier if you prefer.

"Yours very truly,

"James S. Graham,

"c/o Graham Realty Co."

This letter clearly implies Graham's equitable ownership of the property, and the equitable ownership of his purchaser as to the front 100 feet thereof. The loan subsequently made in November, for which plaintiff's mortgage was given, was so made pursuant to the foregoing letter and the information contained therein, supplemented by oral conversations over the telephone. Graham was not a witness upon the trial. The plaintiff purports to rely upon the evidence of Roe, who was

called as a witness, and assumes therefrom that the equitable ownership of Graham was contradicted by such evidence by Roe. From this evidence it appears that Graham was a dealer in real estate, and that the property had first been listed with him by Roe for sale. It also appears therefrom that, in so listing it, Roe gave him the privilege of either finding a purchaser or buying it himself at the stated price of $6,200. He was unable to produce the contract. He testified as follows:

"I do not remember exactly when Mr. Graham and I began negotiations for the sale of this lot; it was sometime in 1919, I think, a couple of months before I made the deed to him. * * * I suppose I listed the property with Graham a couple of months before he sold it. It was just a listing—giving a price. If he found a buyer at a certain price, I would sell; and there was a written listing to that effect. I had not entered into a contract to sell the place to Graham until just before the place was finally sold. He said, 'If you give me a week's time, if I don't sell it for you, give me another week's time, and if I don't sell it, I'll take it over myself;' because the written contract read in there to that effect. He asked for three days more, and when the three days were up, he asked for two days more, and at the end of the second day, he sold it. I suppose he was selling it, or had some buyer for it, from the way he talked: but when he finally gave me that contract, I read it over, and I found out that I had sold it to Graham; that the property had been sold to Graham, and not to some party he got for me. And instead of having to pay the commission for selling it, the price I was to get, I got all of it. There was no commission deducted from it. That made me think he took it over himself; that Graham was buying it, instead of having sold it to some outside party. The papers and deed were fixed up right away, within three or four days, and left at the bank for him to finish paying for it. I left the deed and abstract at the Cedar Rapids National Bank, with directions to turn them over when the purchase price was paid: that is, when Mr. Graham called for them and left the money there. The deal was closed along these lines. The money was left at the bank, and I was notified that Mr. Graham had left so much money there for me."

Redirect Examination.

"* * * Mr. Graham and I had been negotiating for some time. I think several months. I first listed the property with him for sale, and afterwards he agreed to buy it himself, if he did not find a buyer. He did not find a buyer, and then he took it over himself. I think it was two months after I first listed it with him. When I listed it with him, he wrote something in the original contract, what the understanding was between us, and I signed it; but I do not recall when it was."

The foregoing is the entire evidence of Roe as to the time when the written contract was entered into between him and Graham. The most that can be said of it is that it is indefinite and uncertain, and does not of itself fix any date for such contract. But this is far from saying that it is necessarily contradictory to the previous evidence which we have just considered.

It must be held, therefore, upon this record, that defendant Kline did acquire an equitable interest in the property for a valuable consideration on October 11, 1919, and that her actual occupancy of the property operated as constructive notice to the plaintiff of such interest; and furthermore, that the letter of October 13th written by Graham to the plaintiff operated as actual notice of her interest in the property, as a purported purchaser. Whether such notice is necessarily decisive of the disputed rights of the parties is another question. If the plaintiff is entitled to be deemed the holder of a purchase-money mortgage, then, perhaps, notice of inferior liens could not be effective to destroy its rights thereunder. On the other hand, if its transaction with Graham was a mere loan of money, without any present intention that it be used for the payment of the purchase price of the mortgaged property, then its lien attached as of November 10th, and became subject to all pre-existing liens of which it had notice, actual or constructive.

II.  Is the evidence sufficient to warrant the finding that the plaintiff's mortgage was intended as a purchase-money mortgage? That is to say, does it appear from the evidence that the loan was mutually intended by mortgagor and mortgagee for that purpose? The burden of proof is upon the plaintiff, and it is a substantial burden. Its mortgage does not purport to be

a purchase-money mortgage. On its face, it purports only to be security for an ordinary loan, as of November 10, 1919. If it was intended to be something more than it appears upon its face, that fact should be made to appear by satisfactory evidence. The only evidence we find in the record on that subject is certain circumstantial evidence that Graham did in fact use the money borrowed in .payment of the purchase price. As already indicated, the loan was arranged for by correspondence and by telephone conversation. We have already set forth the first letter, under date of October 13th. Under date of November 10th, Graham wrote the plaintiff the following letter:

"Cedar Rapids, Iowa, Nov. 10, 1919.
"Ely Savings Bank, Ely, Iowa
"Gentlemen:

"Inclosed find note and mortgage for the Blake Boulevard loan, as per phone.

"If O. K. send mtge., for record. The insurance policies, abstract, and M. D. Porter's opinion, approving title will be forwarded to you just as soon as completed. Kindly send check to order myself and oblige,
"Yours very truly,
"James S. Graham,
"c/o Graham Realty Co."

A draft for $3,500 was sent to Graham on November 13th, pursuant to the foregoing letter. The official of the plaintiff who conducted the negotiations was Yelinek, cashier. He was called as a witness by the plaintiff. After testifying that he had charge of the negotiations with Graham, and that he communicated with him both by correspondence and by telephone, he identified the $3,500 draft which had been sent to Graham. Such is the full scope of his evidence. He disclosed no communication, oral or written, which had any tendency to show that the plaintiff or its officials had any expectation or intention as to the use that should be made of the borrowed money. As already indicated, Graham did not testify. The record, therefore, contains no evidence as to his intention. Roe testified that he had no acquaintance with the plaintiff; that he had no knowledge of the source of the money used in the final payment of the

purchase price to him; that it was paid in his absence into the Cedar Rapids National Bank; and, in substance, that he had no knowledge of the transaction between plaintiff and Graham.

As circumstantial evidence that the money received by Graham was used for the payment of such purchase price, the plaintiff put in evidence the bank account of Graham in the Security Savings Bank and the bank account of Roe in the Cedar Rapids National Bank. From these respective accounts it appeared that, on November 14th, Graham deposited the $3,500 draft to his own account; that, on the same day, or on the next day, he checked out a total of $3,550. This is all that appears as to Graham. As to Roe, it appears from his bank account that $4,708 was deposited to his credit on November 15th. Roe testified to his belief that this was the balance due on the contract of purchase, but that he had no personal recollection of the item of deposit. If we are to find that the money was loaned by the plaintiff in reliance upon the security of a purchase-money mortgage, as distinguished from an ordinary mortgage, and with the intent that the money borrowed should be used in payment of the purchase price, it must be so found upon the foregoing evidence. If the burden of proof upon the plaintiff in such a case were a technical or formal one, it may be that a court could properly indulge in sufficient inference to make the evidence effective. But the proof that shall lift the security of the plaintiff to the higher level of a purchase-money mortgage, and shall thereby advance it in priority over the meritorious claim and equitable standing of an innocent purchaser for substantial value, should be of a substantial and convincing character. The evidence in this record cannot be so characterized. At its critical points, it calls for the aid of undue inferences by the court. Other than the mere fact, if such it be, that Graham used the proceeds of the loan in the payment of the purchase price, there is nothing in the negotiations themselves that indicates any reliance or expectation on the part of the mortgagee that the proceeds should be so used.

The appellee stresses the two following sentences in the letter of October 13th:

· "The title at present is in James J. Roe. We would take it over and make loan ourself."

If it be granted that the foregoing would be consistent with an intent to negotiate a purchase-money loan, yet it is not inconsistent with the contrary view. It clearly falls short of affirmative proof of such intent. If there was such intent in fact, the witnesses who had personal knowledge of it were apparently available to the plaintiff. One of them (Yelinek) was examined by the plaintiff, but was not examined on that subject. We should not be justified in supplying by mere inference the deficiency of proof of facts which, if true, could have been proved by direct evidence.

In further avoidance of such apparent deficiency, the appellee puts forward a quotation from our opinion in *Laidley v. Aikin*, 80 Iowa 112, as follows:

"It is not essential that there should be a prior agreement between the parties to give the mortgages priority. No such condition is necessary."

The foregoing, standing alone, is somewhat misleading. It should be construed in the light of its context, including the facts under consideration in that case. In that case, Gilpin was the vendor, and Aikin the vendee, in a title bond for the conveyance of real estate. In order to enable Mary Aikin to acquire title under the bond, Johnson loaned her $800, and Joshua Aikin loaned her $450. Each lender took a mortgage, the Johnson mortgage being made superior to that of Joshua Aikin. The proceeds of each loan were paid by the respective mortgagees, not to Mary Aikin, the vendee, but to Gilpin, the vendor. Mary Aikin received none of it. It was held that the mortgages took priority as purchase-money mortgages, over the lien of an existing judgment against Mary Aikin, in that the negotiation of the loans and the payment of the proceeds and the making of the deed were all parts of one transaction. Indeed, Gilpin, as a loan broker, negotiated the Johnson loan, Johnson himself being a resident of New York. The Johnson mortgage was delivered to Gilpin for Johnson, and the draft for the loan was sent by Johnson to Gilpin, who retained the same and applied it on the purchase price. These facts were sufficient of themselves to evidence the intention of the parties that the mortgages should be purchase-money mortgages. For that purpose they had no need of the aid of an express formal

agreement or formal condition. That is all that is meant by the language above quoted from the opinion. To construe such language to the effect that no proof of intent is necessary, would be to run counter to all other authority on the question.

We feel constrained to hold, therefore, that the plaintiff did not make the loan in question with any understanding or reliance or limitation as to the use to which the proceeds should be put.

III. It is further contended by the plaintiff that the contract of purchase held by the defendant Kline gave express consent that Graham should place a mortgage thereon. Such contract contains the following provision:

"When a first mortgage loan on said premises shall be negotiated by either party hereto, with any building and loan association, for the amount due hereunder, *the party of the second part agrees to execute and deliver such mortgage*, and the party of the first part upon receipt of such sum agrees to execute and deliver deed to the said second party; * * *"

3. VENDOR AND PURCHASER: construction of contract: merging unpaid payments into mortgage.

Defendant Kline was the "second party" referred to in the foregoing. It will be noted that this provision contemplates the possible execution of a mortgage by the "second party," pursuant to negotiations by either party. In the event of the execution of such a mortgage by defendant Kline, she was to receive full credit upon her contract for the amount of such mortgage. In other words, her liability to that extent would be transferred from the contract to the mortgage. There is nothing in such contract which implies a consent by the "second party" that Graham should make a mortgage upon the property contracted for.

IV. The contract between Graham and defendant Kline contained the following paragraph:

"The party of the first part covenants and agrees that he will collect no money hereunder beyond the amount of the value of his equity in said real estate; and if said first party shall hereafter collect or receive any moneys hereunder beyond the amount of value of his said equity, he shall be considered and held as col-

4. VENDOR AND PURCHASER: construction of contract.

lecting and receiving said money as the agent and trustee of the party of the second part and for his use and benefit.''

The plaintiff relies upon the foregoing provision as being effective to destroy any right of defendant Kline's to claim any benefit as against the plaintiff for the payments made by her to Graham. We see very little significance in the quoted provision. Graham's covenant that he would collect no more than his equity served no function. Without such covenant he had no right to collect more than was due him, and his covenant in that regard added nothing to the rights of Kline. As to the remainder of the quoted provision, if any meaning can be given to it, it was clearly not intended to be hostile to the interests of Kline. If it could serve any function, it was for the benefit of Kline, in that it was apparently intended to preserve to her a right of action to recover overpayments, if any were made. We see nothing in such provision which prejudices the right of Kline to claim the benefit of the payments which she made pursuant to her contract, and in ignorance of the plaintiff's mortgage.

It is our conclusion, therefore, that the plaintiff was at all times chargeable with notice of the rights of defendant Kline under her contract of purchase; that the defendant Kline is entitled to the enforcement of her contract and to credit for the payments made thereunder.

She has brought into court, as a tender, the balance of the purchase price due from her, amounting to somewhat more than $2,000. The plaintiff is entitled to appropriate it to the payment of its mortgage. Such is the full measure of the relief to which it is entitled, as against the south 100 feet of the mortgaged property. The plaintiff would have been entitled to further relief to the extent of the full value of the remaining 40 feet, if it had not voluntarily released the same from the operation of its mortgage. Improvidently it made such release without adequate consideration, and without the consent or knowledge of the defendant Kline, whose interests would have been vitally affected by such release if the plaintiff's mortgage were established as a purchase-money mortgage.

For the reasons herein indicated, we are of opinion that the decree below should be reversed, and that the defendant

Kline is entitled to a decree consistent with this opinion.—
Reversed.

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.